**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EDWARD D. KRENIK,
106 N. Quaker Lane
Alexandria, VA 22304,

*Plaintiff*,

v.

PETER A. FELDMAN, in his official capacity as Commissioner and Acting Chair of the Consumer Product Safety Commission,
U.S. Consumer Product Safety Commission
441 G St. NW
Washington, DC 20548;

CONSUMER PRODUCT SAFETY COMMISSION
441 G St. NW
Washington, DC 20548;

JAMES WEBB, in his official capacity as Security Specialist for the Consumer Product Safety Commission,
U.S. Consumer Product Safety Commission
441 G St. NW
Washington, DC 20548;

JOHN DOE CPSC EMPLOYEES 1-10, employees of the Consumer Product Safety Commission, in their official capacities,
U.S. Consumer Product Safety Commission
441 G St. NW
Washington, DC 20548,

*Defendants*.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Civil Case No. 1:26-cv-3658

Plaintiff Edward D. Krenik brings this civil action for declaratory and injunctive relief to stop Defendants Consumer Product Safety Commission ("CPSC" or "Commission"), CPSC Commissioner and Acting Chair Peter A. Feldman, CPSC Security Specialist James Webb, and John Doe CPSC employees from depriving Mr. Krenik of his First and Fifth Amendment rights.

In support, Plaintiff alleges the following:

1. Mr. Krenik has spent much of his decades-long career advocating before Congress and Executive Branch agencies. He does what the First Amendment guarantees every American the right to do: speak freely and petition the government without fear of government reprisal or sanction.

2. Mr. Krenik is a registered lobbyist. In fall 2025, exercising his own and his client's rights, he urged Defendant Feldman to act on a matter pending before CPSC. He also told Defendant Feldman that his client had authorized him to take its concerns to the White House. Then he did exactly that.

3. Recently—and within days of Senate confirmations which restored the Commission's quorum allowing the Commission to return to full functionality—Defendants struck back. Without notice, without hearing, and without identifying a single factual basis, Defendants declared Mr. Krenik a "credible threat." They prohibited Mr. Krenik indefinitely from every CPSC facility and "any areas located directly outside" the facilities, threatened him with arrest, and banned him from even requesting an in-person meeting (the "Bar") (attached as Ex. 1).

4. The Constitution forbids Defendants' actions. Courts in this District have repeatedly enjoined federal officials from restricting access to government buildings and officials to punish disfavored advocacy—whether by law firms or by the press. *See, e.g.*, *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15 (D.D.C. 2025), *appeal filed*, No. 25-5310 (D.C.

Cir. Aug. 26, 2025); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025), *appeal filed*, No. 25-5241 (D.C. Cir. July 2, 2025); *see also N.Y. Times Co. v. Dep't of Def.*, 837 F. Supp. 3d 1 (D.D.C. 2026), *stay granted pending appeal*, No. 26-5253, 2026 WL 2168070 (D.C. Cir. July 16, 2026); *Cable News Network, Inc. v. Trump*, No. 26-cv-3287 (TJK), 2026 WL 2868560 (D.D.C. Sept. 24, 2026). The outcome should be no different for a lobbyist petitioning an agency.

5. The Due Process Clause requires the government to give a person a meaningful opportunity to be heard before it deprives him of a protected liberty interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). When, as here, the government strips one's liberty interests with *no process at all* the constitutional violation is plain. *See Susman Godfrey*, 789 F. Supp. 3d at 51.

6. Defendants' Bar retaliates against Mr. Krenik's protected speech and petitioning, abridges his and his clients' right to petition, and deprives him of liberty without due process of law. He respectfully asks this Court to declare the Bar unlawful and enjoin its enforcement.

## PARTIES

### Plaintiff

7. Plaintiff Edward D. Krenik is a registered lobbyist who owns and operates a government affairs business, NorthStar EK LLC. He resides in Alexandria, Virginia.

8. Over a career spanning nearly four decades, Mr. Krenik has served in both the public and private sectors.

9. He began his career on Capitol Hill in 1987, working for Senator David Durenberger and later for Representatives Dean Gallo and Rodney Frelinghyusen, and rose to the role of Legislative Director. From 2001 to 2003, he served as the Associate Administrator for the

U.S. Environmental Protection Agency's Office of Congressional and Intergovernmental Relations.

10. After leaving public service, Mr. Krenik became a government affairs professional and registered lobbyist. For more than 23 years, he has advocated on behalf of companies and industry trade associations before Members of Congress and federal agencies, including the CPSC.

11. THE HILL newspaper named him a "Top Lobbyist" in 2008 and 2021.

12. Mr. Krenik has earned a reputation for persuasive and honest advocacy. In 2019, former CPSC Chairman Elliot F. Kaye described him as having "the Midwest understated and pleasant way of interacting" and being "very good at understanding what … pressure points are in a nonthreatening way[.]" Myron Levin, *Consumer Product Safety Rules and the Lobbyists Who Work to Scuttle Them*, The Am. Prospect (Mar. 14, 2019), https://prospect.org/2019/03/14/consumer-product-safety-rules-lobbyists-work-scuttle/.

13. In January 2026 he opened his own lobbying shop, NorthStar EK LLC, where he is the sole owner and only lobbyist.

**Defendants**

14. Defendant Consumer Product Safety Commission is an independent regulatory commission and agency under 5 U.S.C. § 551(1). It is headquartered in Washington, District of Columbia.

15. Defendant Peter A. Feldman is named in his official capacity as a Commissioner and Acting Chair of the CPSC.

16. Defendant James Webb is named in his official capacity as a Security Specialist for the CPSC.

17. Defendants John Doe CPSC Employees 1-10 are CPSC employees, other than Webb and Feldman, who participated in the decision to bar Mr. Krenik from CPSC's facilities. Plaintiff does not yet know their identities. Plaintiff will seek leave to amend this Complaint to name them when their identities are ascertained. Each is sued in his or her official capacity as a CPSC employee.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction because the claims arise under the Constitution and laws of the United States. *See* 28 U.S.C. § 1331.

19. The Court may award the requested relief under 28 U.S.C. §§ 2201 and 2202 and pursuant to its inherent equitable powers.

20. Venue in this District is proper under 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

### Background

21. Mr. Krenik has long advocated before the CPSC on behalf of manufacturers and trade associations. Approximately 80% of his current work involves advocacy before the CPSC, and a similar proportion of his firm's revenue comes from clients with matters before the Commission, including petitions, rulemakings, investigations, and product safety standard development.

22. He advocates for his clients through in-person meetings, phone calls, video meetings, and texts. The advocacy method he chooses depends on many factors, including client needs and agency customs and practices.

23. His decades of experience in government and as a lobbyist have taught him that in-person connections and communications are the foremost form of advocacy. Meeting in person

lets Mr. Krenik and his clients read the room and pick up on nuances that phone calls and video meetings miss.

24. In-person advocacy is central to his work.

25. For many years, Mr. Krenik has made a practice of requesting in-person meetings with newly confirmed CPSC Commissioners shortly after they take office. Over his career he has met with at least 10 CPSC Commissioners, including Defendant Feldman. Most of those meetings took place at CPSC headquarters, but he has also taken Commissioners to visit his clients' manufacturing and testing sites.

26. Mr. Krenik also regularly attends CPSC public meetings in person, including the Commission's annual Agenda and Priorities Hearing and other meetings whose agenda items affect his clients. Attending in person allows him to interact with the Commissioners and staff.

27. In all his years of advocacy before the CPSC, Mr. Krenik has never been disruptive at any CPSC facility or meeting. Before August 2026, no one at the CPSC ever complained to him about his conduct or suggested that it was improper.

28. Mr. Krenik has known Defendant Feldman since at least 2018. Their professional paths crossed earlier, when Defendant Feldman was a Senate staffer, and in 2018 Mr. Krenik helped prepare him for his Senate confirmation hearing.

29. Defendant Feldman gave Mr. Krenik his personal cellphone number around 2018, if not earlier. Until fall 2025, the two had a generally cordial professional relationship and spoke on occasion. They communicated by official email, CPSC phone, personal cellphone, personal text messages, and in person.

30. Lobbyists commonly communicate with Commissioners and other agency officials by personal phone and text message. Lobbyists also commonly use multiple avenues of advocacy

at once, such as lobbying Congress or raising concerns with the White House while also lobbying an agency.

31. In fall 2025, Mr. Krenik was lobbying on behalf of CPSC-regulated clients with matters pending before Defendants CPSC and Feldman.

32. As part of that effort, Mr. Krenik called Defendant Feldman on his personal cellphone, as he had done in the past.

33. During that call, Mr. Krenik urged Defendants CPSC and Feldman to become more involved in the workings of CPSC's various offices, including the compliance office. He highlighted his concern that those offices' actions seemed out of step with the Trump Administration's stated priorities.

34. Mr. Krenik also alerted Defendant Feldman that Krenik's client had authorized him to lobby the White House directly.

35. Shortly after, Mr. Krenik contacted White House personnel for that purpose and raised concerns regarding Defendants CPSC's and Feldman's actions. On information and belief, White House personnel contacted Defendant Feldman and admonished him.

36. Defendant Feldman declined to take the actions Mr. Krenik urged, as Mr. Krenik later learned from his White House contacts.

37. Mr. Krenik understood that Defendant Feldman might be sensitive to criticism from White House personnel for two independent reasons.

38. First, Mr. Krenik was aware that Defendant Feldman was interested in becoming the permanent chair of the CPSC. Such an appointment could only occur if President Trump nominated Defendant Feldman. In early 2025, Defendant Feldman called Mr. Krenik and sought his help in that effort, asking Mr. Krenik to rally support from his clients.

39. Second, in May 2025, President Trump fired three CPSC Commissioners demonstrating his attentiveness to actions within or on behalf of the Commission. *See Trump v. Boyle*, 145 S. Ct. 2653 (2025).

40. Mr. Krenik's last contact with Defendant Feldman was on August 14, 2026, when he texted to congratulate him on the confirmation of Commissioners Karen Sessions and Brien Lorenze and for getting the Commission's quorum back.

41. Commissioner Karen Sessions was confirmed by the Senate on August 7, 2026. Her term started on August 19, 2026.

42. Commissioner Brien Lorenze was confirmed by the Senate on August 7, 2026. His term started on September 8, 2026.

**Defendants Falsely Accuse Mr. Krenik of Prohibited Conduct**

43. On information and belief, on or about August 8, 2026, one day after the new Commissioners were confirmed but before they joined the Commission, one or more Defendants contacted the Federal Protective Service ("FPS"). FPS is a law enforcement agency within the Department of Homeland Security ("DHS") that protects federal buildings and the people who work in and visit them.

44. On information and belief, Defendants made a report about Mr. Krenik, falsely alleging that he engaged in prohibited conduct and that he posed a credible threat to the agency and its employees.

45. As a result of Defendants' report, FPS opened an investigation into Mr. Krenik's conduct.

46. On the evening of August 14, 2026, an FPS investigator called Mr. Krenik.

47. The investigator asked whether Mr. Krenik knew Defendant Feldman, and he said that he did. She also inquired about texts Mr. Krenik sent to Defendant Feldman in October 2025.

48. On August 17, 2026, Mr. Krenik emailed the FPS investigator seeking a copy of the investigation report.

49. The investigator told him to request the report from DHS's Privacy Office.

50. On August 27, 2026, Mr. Krenik submitted a Freedom of Information Act request to the DHS Privacy Office for the report. As of this filing he has not received a copy of the report.

**CPSC Unlawfully Bars Mr. Krenik from Its Facilities**

51. On August 28, 2026, Defendant Webb issued a letter to Mr. Krenik stating that he is "prohibited from entering any [CPSC] facility or any federally leased space occupied by CPSC personnel, and any areas located directly outside" such locations. Ex. 1 at 1.

52. On information and belief, FPS was not involved in issuing the letter or the decision barring Mr. Krenik from CPSC's facilities.

53. The letter purports to serve as "formal notice" that CPSC barred Mr. Krenik from entering *any* CPSC facility or leased space. Ex. 1 at 1. It also lists four specific locations, including CPSC's former headquarters in Bethesda, Maryland and its current headquarters in the Government Accountability Office ("GAO") Building in Washington, DC.

54. The Bar does not stop at the CPSC's doors. It also restricts Mr. Krenik from entering "any areas located directly outside" any CPSC facility. Ex. 1 at 1. The letter repeats the prohibition when it warns him that he "may be arrested and charged with trespassing on federal property" if he enters these areas. *Id.* at 2.

55. The letter does not define the "areas located directly outside" CPSC's facilities, identify their boundaries, or explain how Mr. Krenik can know when he has entered one. Mr. Krenik cannot determine where those areas begin or end.

56. The areas located directly outside CPSC's headquarters include public sidewalks, streets, plazas, and nearby buildings such as the National Building Museum. On information and belief, CPSC does not own or control these other spaces, which are open to the public.

57. The GAO Building, which takes up almost an entire city block, also houses office space for other government agencies, including the GAO's and U.S. Army Corps of Engineers' headquarters.

58. Mr. Krenik uses and passes through these areas to meet with officials of other agencies housed in the GAO Building and to attend nearby events, including fundraisers at the National Building Museum. He has met with GAO and Army Corps staff to lobby for his clients, both in the GAO Building and at nearby locations such as the National Building Museum's cafe.

59. As the basis for the Bar, the letter states:

> Reason for Restricted Access
>
> Your recent conduct has been determined to pose a credible threat to agency personnel and federal operations. Your repeated abusive and disruptive behavior, along with your continued attempts to contact staff using improper and unauthorized communication channels, constitute serious violations of federal property regulations and security directives. As a result, the Department of Homeland Security, the Federal Protective Service (FPS), and the General Services Administration have been notified and are actively coordinating with the agency to assess and mitigate risk.

*Id.*

60. The letter does not provide any specific dates, statements, details, or acts on which Defendants' decision rests.

61. Defendants gave Mr. Krenik no advance notice that they believed his conduct violated any law or regulation or that they intended to bar him.

62. On information and belief, Mr. Krenik's alleged "abusive and disruptive behavior" was the fall 2025 phone call in which he told Defendant Feldman that he would contact White House personnel and request their intervention on behalf of his client. *See supra* ¶¶ 31–36.

63. That call, and Mr. Krenik's later call to lobby White House personnel on his client's behalf, were protected First Amendment activity. *See Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) (registered lobbyists "are protected by the First Amendment right to petition"); *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment.").

64. On information and belief, the letter's reference to "continued attempts to contact staff using improper and unauthorized communication channels" refers to Mr. Krenik's calls and texts to Defendant Feldman's personal cellphone rather than his government-issued cellphone.

65. However, Mr. Krenik—a member of the public—is under no legal obligation to use specific communication channels when contacting government officials. That legal requirement applies only to government personnel, like Defendants, who have recordkeeping and disclosure obligations under the Federal Records, Freedom of Information, and Privacy Acts. *See, e.g.*, 44 U.S.C. § 2911.

66. On information and belief, Defendant CPSC's employees and Defendant Feldman have a pattern and practice of using personal devices for government business.

67. For example, Defendant Feldman, on several occasions, used his personal cellphone to contact Mr. Krenik.

68. The letter invokes 40 U.S.C. § 1315 and 6 C.F.R. part 139 while stating that CPSC's "determination has resulted in the immediate enforcement of federal law and regulations." Ex. 1 at 1.

69. It warns that if Mr. Krenik attempts to enter any CPSC facility or "any areas located directly outside of these buildings," he "may be arrested and charged with trespassing on federal property, consistent with the enforcement actions allowed under federal regulations and FPS authority." Ex. 1 at 2.

70. Violating 6 C.F.R. part 139 is a Class C misdemeanor punishable by up to 30 days in jail and a fine of up to $5,000. *See* 40 U.S.C. § 1315(c)(2); 6 C.F.R. § 139.85; 18 U.S.C. § 3559(a)(8) (classifying offense where "the maximum term of imprisonment authorized is … thirty days or less but more than five days, as a Class C misdemeanor"); 18 U.S.C. § 3571(b)(6) (prescribing fine "for a Class B or C misdemeanor that does not result in death, [of] not more than $5,000.").

71. Contacting an agency or government official on their personal cellphone violates neither 40 U.S.C. § 1315 nor 6 C.F.R. part 139.

72. Section 1315 empowers the Secretary of Homeland Security to protect federal property and authorizes the Secretary to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property." 40 U.S.C. § 1315(a), (c)(1).

73. Those regulations are codified in 6 C.F.R. part 139, which prohibits certain conduct affecting the use of and access to Federal property. *See, e.g.*, 6 C.F.R. §§ 139.25, 139.35; *see also* § 139.15 (defining "Federal property").

74. The letter's generic allegations do not establish any legal violation. *See* Ex. 1.

75. For example, 6 C.F.R. § 139.35(a) prohibits "[d]isorderly conduct, which includes, but is not limited to, assaulting, fighting, harassing, intimidating, threatening or other violent behavior, lewd acts, or the inappropriate disposal of feces, urine, and other bodily fluids." And 6 C.F.R. § 139.35(f) prohibits "[t]hreatening by any means, including but not limited to by mail, facsimile, telephone, or electronic communications, to commit any crime of violence."

76. Sections 139.35(a) and (f) prohibit "threatening" behavior only when it involves violence.

77. Mr. Krenik has engaged in no conduct prohibited by 40 U.S.C. § 1315 or 6 C.F.R. part 139.

78. Mr. Krenik merely informed Defendant Feldman that if he was not persuaded by Mr. Krenik's arguments on behalf of his client then he would contact the White House—which he did.

79. That is constitutionally protected speech and petitioning. Defendant Feldman may not like Mr. Krenik's speech, petitioning, or the tactics he took on his client's behalf, but none of his actions are a federal crime.

80. Defendants intended the letter's intimation that Mr. Krenik violated the law, and its threat of enforcement against him, to chill his constitutionally protected speech and petition rights. It has done so.

81. For example, it is Mr. Krenik's routine business practice to request in-person meetings with newly confirmed Commissioners and their staff.

82. Mr. Krenik's decades of experience in government and as a lobbyist have taught him that in-person meetings help build rapport between himself, his clients, and government

officials, including agency heads. That connection cannot be replicated by impersonal methods like email, telephone calls, and online meetings.

83. Because of the Bar, he has not sought meetings with Defendant CPSC's newly confirmed Commissioners, Sessions and Lorenze, out of fear that he will be arrested and charged with violating federal law. This contradicts his long-standing practice.

84. Likewise, he has had to change his business practices because he cannot request or attend in-person meetings on behalf of his clients or accompany them to meetings with the Commissioners and CPSC staff. He has had to tell his clients that he cannot attend in-person meetings.

85. Now that the Commission has regained its quorum, it may begin holding the Commission meetings that Mr. Krenik typically attends in person. The Bar prevents him from attending them.

86. Mr. Krenik has not set foot in or near a CPSC facility since he received the letter.

87. In early October 2026, Mr. Krenik disclosed the Bar to his clients. As a result, he lost at least one client that accounted for a significant amount of the firm's revenue.

88. Because the letter does not define the "areas located directly outside" CPSC's facilities, Mr. Krenik also cannot attend events, meet with clients or colleagues, or walk on public sidewalks near those facilities without risking arrest.

89. The Bar impairs his ability to pursue his chosen profession, a profession he practices well-within the scope of the First Amendment's protections. Because Mr. Krenik is his firm's sole owner and only lobbyist, the Bar threatens his livelihood.

90. The Bar has also harmed his reputation by falsely suggesting that he has engaged in prohibited conduct. And it stigmatizes him as a dangerous individual by declaring that he

"pose[s] a credible threat to agency personnel and federal operations." Ex. 1 at 1. That accusation is false.

91. On information and belief, Defendants reported Mr. Krenik to FPS and issued the Bar to harm Mr. Krenik, his business, and his clients.

92. Reporting Mr. Krenik to FPS and barring him from accessing CPSC facilities *nearly a year* after a call Defendants apparently deem "disruptive" makes no sense from a security perspective. And, Mr. Krenik's most recent message to Defendant Feldman, the August 14, 2025 text congratulating him on the restored quorum and asking whom to contact to schedule a meeting, threatened no one.

93. The timing makes sense only as retaliation; Defendants contacted FPS shortly after the Senate confirmed Commissioners Sessions and Lorenze.

94. From August 2025 until Commissioners Sessions and Lorenze took office, Defendant CPSC operated without a quorum, which severely limited the actions it, or Defendant Feldman, could take. *See* 15 U.S.C. § 2053(d) (describing CPSC quorum requirements).

95. With Commissioners Sessions and Lorenze in office, Defendant CPSC can operate fully, including by making decisions related to issues concerning Mr. Krenik's clients.

96. By barring Mr. Krenik from CPSC's facilities, Defendants have chilled his protected speech and petition rights.

97. On information and belief, Defendants have barred no other lobbyists from CPSC's facilities for similar alleged conduct, including contacting CPSC employees or Commissioners on their personal cellphones.

98. The Bar restricts Mr. Krenik's future communications to three specific CPSC-approved "non-physical channels": (1) "[w]ritten communication delivered by mail"; (2) "[e]mail

sent to designated public contact addresses"; and (3) "[t]elephone contact through official public numbers." Ex. 1 at 2.

99. The Bar prohibits Mr. Krenik from even requesting "in-person interaction," regardless of whether that interaction would take place at CPSC-controlled facilities, stating "[a]t no point should you attempt to schedule or request in-person interaction." Ex. 1 at 2. It also declares that Mr. Krenik "may not appear in person at any CPSC or affiliated federal location for any reason." *Id.*

100. As discussed above, CPSC's headquarters is in the same building as other federal agencies that Mr. Krenik has lobbied in the past. As such, the letter purports to impair his access to other federal agencies merely because they share a building.

101. Section 1315 and 6 C.F.R. part 139 only relate to actions or activities on "Federal property."

102. The letter states that the restriction is perpetual and may only be "rescinded jointly by" CPSC and FPS. Ex. 1 at 2.

103. Defendants gave Mr. Krenik no notice of the Bar until he received the letter.

104. Before August 28, 2026, Mr. Krenik had never been barred from any federal facility.

105. Defendants have provided no process for Mr. Krenik to challenge the Bar or seek its rescission.

106. On September 25, 2026, FPS special agents contacted Mr. Krenik at his home to follow up on the initial report.

107. When Mr. Krenik asked about CPSC's letter barring him from its facilities, one of the agents told him that FPS had nothing to do with the Bar and that it was the CPSC's doing. Neither agent indicated any awareness that CPSC had sent the letter.

108. On information and belief, neither FPS nor its employees took part in the decision to bar Mr. Krenik from CPSC's facilities. Nor did they participate in the drafting, editing, or approval of the August 28 letter to Mr. Krenik.

109. On information and belief, Defendants alone decided to bar Mr. Krenik from CPSC facilities.

110. The letter states that the Commission itself did not review or approve the Bar. Each page includes a disclaimer that states: "This memorandum was prepared by the CPSC staff. It has not been reviewed or approved by, and may not necessarily reflect the views of, the Commission." Ex. 1.

111. On information and belief, the Commission has never voted on, adopted, or ratified the Bar.

112. Nor has the Commission published any rule, policy, or standard that authorizes CPSC staff to bar a member of the public from its facilities, or from the areas surrounding them, for the conduct the letter describes.

113. The letter's statements insinuating that FPS played a role in barring Plaintiff from CPSC's facilities are false. Defendants included them to deter Mr. Krenik from engaging in protected First Amendment activities.

## CLAIMS FOR RELIEF

**Count One**
**Violation of the First Amendment**
**Retaliation**

114. Plaintiff incorporates by reference all the preceding material as though fully set forth herein.

115. The First Amendment states that "Congress shall make no law … abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

116. Government officials may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). For this reason, "[t]he First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)); *see also Perkins Coie*, 783 F. Supp. 3d at 150–51.

117. "[R]etaliation based on the exercise of the right to petition the government ... violates that right, and the associated liberty interest, in the same way that retaliation based on protected speech violates the First Amendment." *Perkins Coie*, 783 F. Supp. 3d at 172–73.

118. To prevail on a First Amendment retaliation claim, a plaintiff must show that "'(1) "[they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [their] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action

against' them." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (alterations in original) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)).

119. Mr. Krenik's work as a lobbyist involves written and oral advocacy on behalf of his clients. At times, his advocacy is at odds with the policy preferences of government officials or agencies. But his job is to advocate and persuade even in the face of opposing views, and he does so with all the lawful tools and connections at his disposal. Mr. Krenik advocates his clients' positions on matters pending before Defendant CPSC. As part of that advocacy, he called Defendant Feldman and told him that his client had authorized him to take its concerns to the White House. Mr. Krenik then took his client's position to White House personnel. Mr. Krenik's advocacy is protected by the First Amendment. *See Autor*, 740 F.3d at 182.

120. Even though the apparent instigating phone call occurred in fall 2025, Defendants waited to report Mr. Krenik's conduct and bar him from CPSC's facilities until the moment it would inflict the most harm: after he opened his firm as its sole owner and only lobbyist, and within days of the Senate's confirmation of Commissioners Sessions and Lorenze.

121. A genuine security concern does not lie dormant for the better part of a year. *Cf. Cable News Network*, 2026 WL 2868560, at *2 (finding no urgency justifying denial of pre-deprivation process where some of the conduct at issue "stretches back months or years").

122. Defendants calculated and instituted the Bar to harm Mr. Krenik's business, by limiting how he could advocate for his clients and forcing him to have to disclose the Bar to them. It worked. After Mr. Krenik disclosed the Bar, he lost at least one client that accounted for a significant amount of his firm's revenue.

123. Defendants also timed the Bar to impair his advocacy to the newly confirmed Commissioners. Before the Senate confirmed Commissioners Sessions and Lorenze, the

Commission lacked a quorum, so Defendants CPSC and Feldman could not take official actions affecting Mr. Krenik's clients. After Commissioners Lorenze's and Session's terms started, Defendant CPSC could conduct official business again—the most critical time for Mr. Krenik to advocate for his clients. The Bar keeps Mr. Krenik from engaging the new Commissioners in the same ways as other lobbyists and regulated entities.

124. The Bar also reaches beyond CPSC's facilities to "any areas located directly outside" them. Ex. 1 at 1. By threatening Mr. Krenik with arrest if he enters undefined areas surrounding CPSC facilities, Defendants have deterred him from engaging in protected expression even in "traditional public fora," where the government's ability to restrict speech is "very limited." *McCullen v. Coakley*, 573 U.S. 464, 476–77 (2014).

125. The Bar impairs not only Mr. Krenik's right to advocate, "but also [his right] to select what [he] believe[s] to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

126. Defendants issued the Bar to retaliate against Mr. Krenik for his constitutionally protected speech and petitioning. While Defendants CPSC and Feldman may not like Mr. Krenik's clients, his advocacy, or the fact that he contacted White House personnel when they rebuffed his efforts, such advocacy is fundamental protected speech and lies at the core of the First Amendment.

127. Defendants' invocation of security does not alter the analysis. A "credible threat" claim and determination made the better part of a year after the supposedly threatening conduct, and unaccompanied by any date, statement, or act, never reviewed or approved by the Commission, does not reflect a genuine security judgment. *Cf. Cable News Network*, 2026 WL 2868560, at *2 (expressing skepticism that the asserted security interest was "the actual motivation for, or is even advanced by," the challenged revocations).

128. By restricting his access to CPSC's facilities on dubious and vague grounds and threatening him with criminal sanctions, Defendants have chilled Mr. Krenik's protected speech and petitioning. As a result, he has changed his business practices and has refrained from in-person advocacy for fear of being arrested. The Bar substantially undermines Mr. Krenik's advocacy on behalf of his clients.

129. Restricting a party's access to federal buildings and officials in response to disfavored advocacy is retaliatory action that violates the First Amendment. *See generally Susman Godfrey*, 789 F. Supp. 3d 15; *Perkins Coie*, 783 F. Supp. 3d 105.

130. As a result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm. The Bar retaliates against Plaintiff for his protected lobbying speech in violation of the First Amendment. It should be declared unlawful and enjoined.

## Count Two
## Violation of the First Amendment
## Rights to Petition the Government and Free Speech

131. Plaintiff incorporates by reference all the preceding material as though fully set forth herein.

132. The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

133. Under the First Amendment, speech only sheds its constitutional protection in limited circumstances such as when it constitutes "true threats of violence." *Counterman v. Colorado*, 600 U.S. 66, 72, 143 S. Ct. 2106, 2113, 216 L. Ed. 2d 775 (2023).

134. None of Mr. Krenik's expressive actives fall into any of the unprotected speech categories.

135. Mr. Krenik made no "true threats of violence."

136. The Bar violates his First Amendment speech right.

137. The Bar also violates the First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Petition Clause traces its roots to the Magna Carta. *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395 (2011). Violations of this venerable right were a central indictment against King George III: "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury." The Declaration of Independence para. 30 (U.S. 1776).

138. The rights of speech and petition are "cognate rights" that are "integral to the democratic process." *Borough of Duryea*, 564 U.S. at 388 (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). While not identical, "[t]hese rights … are intimately connected, both in origin and in purpose" and are "inseparable." *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (citation omitted). The right to petition "[is] among the most precious of the liberties safeguarded by the Bill of Rights." *Id.* Indeed, the right is implied by our republican form of government. *See United States v. Cruikshank*, 92 U.S. 542, 552 (1875).

139. A person exercises the right to petition when he attempts to "persuade" government "action." *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (1968). The right provides constitutional protection to registered lobbyists. *See Autor*, 740 F.3d at 182. It also applies to all government departments. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). And restricting entry to federal buildings or interactions with government officials "constitutes a 'significant impairment' of [plaintiff's] right to petition the government." *Susman Godfrey*, 789 F. Supp. 3d at 49 (quoting *Elrod v. Burns*, 427 U.S. 347, 362 (1976)).

140. The Bar violates Mr. Krenik's speech rights. His statements to and communications with Defendants and White House personnel are protected expression. *Streever v. Mullin*, No. 26-cv-2356 (RC), 2026 WL 2720475, at *16 (D.D.C. Sept. 15, 2026) (noting that communications

addressing "salient political decisions to a government official, an arena where the First Amendment's speech protections reach their 'zenith'" are "protected expression" (citation omitted)).

141. The Bar restricts Mr. Krenik's ability to petition the government for himself and his clients. It restricts his ability "to select what [he] believe[s] to be the most effective means for" conducting advocacy—in-person meetings. *Meyer*, 486 U.S. at 424. The Bar restricts him from attending key meetings and advocating for his clients. And it bars him from the areas surrounding CPSC's facilities, where he could otherwise meet with clients, other interested parties, government officials, and other government agencies.

142. Mr. Krenik asserts these claims both for himself and on behalf of his clients. His clients chose him to represent their interests before the Commission, and the Bar prevents them from petitioning the Commission through the advocate they chose. *See Ryan, LLC v. Lew*, 934 F. Supp. 2d 159, 167–68 (D.D.C. 2013).

143. As a result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm. The Bar violates the First Amendment rights to petition the government and free speech. It should be declared unlawful and enjoined.

**Count Three**
**Violation of the Fifth Amendment**
**Due Process**

144. Plaintiff incorporates by reference all the preceding material as though fully set forth herein.

145. The Fifth Amendment to the Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

146. The Due Process Clause requires the government to give a person a meaningful opportunity to be heard *before* it deprives him of a liberty interest. *See Loudermill*, 470 U.S. at

542. When the government excludes a person from its facilities, and that exclusion implicates First Amendment rights, due process requires, at a minimum, "notice of the factual bases" for the exclusion, "an opportunity … to respond," and "a final written statement of the reasons" for it. *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977); *see also Susman Godfrey*, 789 F. Supp. 3d at 49–50; *Perkins Coie*, 783 F. Supp. 3d at 171–72; *Cable News Network*, 2026 WL 2868560, at *1.

147. Courts evaluate procedural due process claims by "determining, first, whether a protected interest held by plaintiff in life, liberty, or property was deprived and, second, whether any process provided was adequate." *Perkins Coie*, 783 F. Supp. 3d at 172.

148. Individuals have constitutionally protected liberty interests in their petition and speech rights. They also have protected liberty interests in their reputation and choice of profession.

149. Mr. Krenik has a protected liberty interest in his right to petition the government. *Perkins Coie*, 783 F. Supp. 3d at 172 (observing that the "liberty interest in petitioning the government is so fundamental … that it is protected under the due process clauses of both the Fifth and Fourteenth Amendments"). Restricting his "access to government facilities and officials, without any prior notice or opportunity to be heard" violates that interest. *Id.* at 173–74. Lobbying is petitioning. *Autor*, 740 F.3d at 182.

150. Mr. Krenik has a protected liberty interest in his speech rights. *Cf. Sherrill*, 569 F.2d at 130–31. The D.C. Circuit has applied this principle to restrictions on access to government facilities. When the government opens a facility for First Amendment activity, a person's interest in that access "undoubtedly qualifies as liberty which may not be denied without due process of

law under the fifth amendment." *Id.* Mr. Krenik's advocacy is speech. The Bar forbids both his physical presence and his requests for in-person meetings.

151. He also has a protected liberty interest in his "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). An agency is "required to provide process when it issues 'findings of wrongdoing' that 'could have an adverse impact on [a person]'s reputation.'" *Susman Godfrey*, 789 F. Supp. 3d at 51 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012)). Defendants provided no process before barring Mr. Krenik. Their findings that he engaged in "repeated abusive and disruptive behavior" and "pose[s] a credible threat to agency personnel and federal operations" are false and have damaged Mr. Krenik's reputation. *See* Ex. 1 at 1.

152. Mr. Krenik also has a "constitutionally protected 'right to follow a chosen trade or profession.'" *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895–96 (1961)). The government may not impose "a stigma or other disability that foreclose[s] [the Plaintiff's] freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573–78 (1972). "Government action that has the effect of 'seriously affect[ing], if not destroy[ing]' a plaintiff's ability to pursue his chosen profession or 'substantially reduc[ing] the value of his human capital,' thus infringes a liberty interest." *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (citations omitted). The Bar has seriously impaired Mr. Krenik's work as a lobbyist and has already cost him a significant client. He cannot even request in-person meetings, let alone engage in person, with CPSC staff or Commissioners. It also stigmatizes him as a dangerous individual when he is not.

153. Due process also requires fair notice. Before the government sanctions a person by restricting access that implicates First Amendment rights, the person must "receive fair notice not

only of the conduct that [will] subject him to punishment, but also of the … magnitude of the sanction that [the government] might impose." *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (citation omitted). The standard must be "explicit and meaningful" and articulated in advance of the deprivation. *Sherrill*, 569 F.2d at 131.

154. The Bar fails that test. He was never provided notice of the conduct that would subject him to sanction *before* being barred. There is no published CPSC rule or standard that defines "abusive and disruptive behavior" or "improper and unauthorized communication channels." *See* Ex. 1 at 1. No one warned Mr. Krenik that contacting an agency official's personal cellphone, or telling that official that he would take his client's concern to the White House, could result in a perpetual bar and threat of arrest. And the statute and regulations cited in the letter do not apply such conduct. The letter does not define the "areas located directly outside" CPSC's facilities from which it bars him, leaving Mr. Krenik to guess where his lawful presence on a public sidewalk ends and a trespass begins. *See id*. At no point before receiving that letter was Mr. Krenik made notified that he could lose his access to CPSC facilities or that he was under threat of arrest.

155. Mr. Krenik's conduct did not violate either 40 U.S.C. § 1315 or 6 C.F.R. part 139.

156. By Defendants' reasoning, most lobbyists in Washington, D.C., should be barred from government buildings or face the threat of criminal trespass. Yet Defendants have barred only Mr. Krenik.

157. Defendants provided no process at all. They gave Mr. Krenik no notice, no statement of the factual basis for the Bar, no opportunity to respond, and no means to seek rescission. The letter conditions rescission on the joint action of CPSC and FPS—an agency whose own agents told Mr. Krenik that FPS had nothing to do with the Bar. The Commission itself never reviewed or approved the Bar. And nothing required Defendants to dispense with pre-deprivation

process, as they waited the better part of a year to address conduct they describe as a "credible threat." *Cf. Cable News Network*, 2026 WL 2868560, at *2.

158. As a result of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm. The Bar violates the Due Process Clause. It should be declared unlawful and enjoined.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests the following relief:

a. A declaration that the Bar is unconstitutional and violates the First and Fifth Amendments to the Constitution.

b. A preliminary and permanent injunction enjoining Defendants and their employees and agents from implementing or seeking to enforce the Bar against Mr. Krenik.

c. A judgment in favor of Plaintiff.

d. An award for all reasonable attorneys' fees and costs incurred herein and that Plaintiff may be entitled to under law, including 28 U.S.C. § 2412.

e. Such other relief as this Court deems just and proper.

Dated: October 20, 2026

Respectfully submitted,

/s/ Kara M. Rollins
Kara M. Rollins (DC Bar #1046799)
Christian Clase (DC Bar #90032158)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
christian.clase@ncla.legal
*Counsel for Edward D. Krenik*